DAVE SCHULTHEIS, Plaintiff-Appellant, v. McWILLIAMS ELECTRIC COMPANY, INC., Defendant-Appellee and Counterdefendant (Waste Management of North America, Inc., *et al.*, Defendants; Waste Management, Inc., Counterplaintiff and Third-Party Plaintiff; Farnsworth McKoane Construction Company *et al.*, Counterdefendants; Tempus Construction Services, Inc., Third-Party Defendant and Counterplaintiff).

First District (2nd Division)   No. 1—89—2752

Opinion filed September 17, 1991.

Burton A. Padove, of Law Offices of Richard F. Mallen, of Chicago, for appellant.

Keevers & Hittle, of Chicago (Kathleen A. Smith, of counsel), for appellee.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

Plaintiff Dave Schultheis appeals from the circuit court's dismissal with prejudice of his complaint against defendant McWilliams Electric Company (McWilliams). He claims that the court erred in finding that he had intended to release defendant from liability for the acts with which he charged defendant, and that even if he had intended to release defendant, the release should have been voided as having been based upon a mutual mistake as to the extent of defendant's liability.

Plaintiff's complaint charged defendant and four other parties with violating the Premises Liability Act (Ill. Rev. Stat. 1985, ch. 80, par. 301

*et seq.*), thereby causing him to be injured when he fell after tripping on scrap electrical conduit material at a construction site on May 27, 1986.

Defendant moved pursuant to section 2—619(a)(6) of the Civil Practice Law (Ill. Rev. Stat. 1987, ch. 110, par. 2—619(a)(6)) to dismiss plaintiff's claim against it, and in support of its motion it submitted the affidavit of Jennifer St. Mary, an insurance company claims adjuster, who deposed that:

"On July 20, 1987, pursuant to negotiations with *** Schulteis [*sic*], I forwarded a check, representing full settlement of his claim against MC WILLIAMS ***, in the amount of $2,931.42, along with a Release. *** The check *** was cashed by Mr. Schulteis [*sic*] in July, 1987. *** The Release *** was never returned to my attention. It is unknown whether Mr. Schulteis [*sic*] ever executed [it]. *** Once Mr. Schulteis [*sic*] received the check, he did not contact me further with regards to his claim against MC WILLIAMS ***."

Defendant also supported its motion with a copy of the letter which St. Mary had stated she had sent to plaintiff. The letter stated:

"I have received *** a copy of your chiropractor bill totalling $820.00 along with your wage information showing your lost wages for the month of October [1986]. I have enclosed a check for $2,931.42 which should fully settle the claim against Mc Williams ***. I have also enclosed a release for that same amount but I need you to fill this out and return to me as soon as possible. Thank you for your co-operation in handling this claim and if you have any questions after reviewing it please feel free to contact [me]."

Finally, defendant provided the court with a copy of the check sent to and cashed by plaintiff.

In opposing the motion, plaintiff filed an affidavit in which he averred, in pertinent part, that:

"4. As a result of the fall, I incurred medical bills, lost time and disability from a herniated disc which was diagnosed *** on September 30, 1988;

5. I received partial compensation from McWilliams Electric for some lost time and a medical bill in July, 1987;

6. I did not intend to abandon or release any claim against McWilliams by acceptance of partial compensation in 1987;

7. I never signed a release for McWilliams or their insurance company;

8. No lawsuit or workmen's comp [*sic*] action was pending on my behalf in 1987, nor did any attorney negotiate with the [insurance] adjuster on my behalf prior to July, 1987;

9. Neither I nor the \*\*\* adjuster knew in 1987 that I sustained a herniated disc as a result of the subject fall."

Plaintiff also submitted a transcript of his deposition in which he testified that he was employed as a carpenter at the construction site where the accident occurred on May 27, 1986. He was diagnosed after the accident as having a lower back sprain and was advised by his doctor not to work for three or four weeks. One day after his doctor allowed him to return to work, toward the "end of June, the beginning of July" 1986, he reinjured his back while performing "light duty." He then missed "two or three weeks" of work. After returning to work at "[f]ull duty" in late July 1986, he continued to have back pain.

Plaintiff began seeing a chiropractor in October 1986 to deal with that pain. At around the same time, he "restrained" his back while lifting sheets of drywall; this incident, however, did not affect the extent of his pain. Nevertheless, he took the advice of his chiropractor and did not work for much of October 1986. After he returned to work at the end of the month, the pain in his back "crept back up," accompanied by "numbness in the \*\*\* right leg." Later, however, he answered "No" to the question, "Between October of 1986 and November 12th of '87, did you have any back pain?"

On November 15, 1986, plaintiff fractured his neck in an auto accident, and was, as a result, unable to work until November 1987. After returning to work, he again began to experience back pain. After undergoing an "MRI and cat scan" in "May or June of [19]88," plaintiff was diagnosed as having a herniated disc. He was advised to "quit work" and to undergo physical therapy. Although he did not quit his employment, he was laid off on September 17, 1988, the same day on which he reinjured his back while lifting drywall. At the time of his deposition on February 17, 1989, plaintiff was seeking employment requiring "light to medium, medium light duty" as allowed by his physician.

Following the May 27, 1986, accident, plaintiff spoke with several representatives of defendant's insurer, including St. Mary, regarding his request for compensation for medical expenses and for "time being off work." He admitted that the July 17, 1987, letter referred to by St. Mary in her affidavit was sent to him along with the check; he denied, however, that any document purporting to be a release accompanied them. He thought the check "was to pay what I had, the $820 for the doctor and for the most, I was off from work because it came down to

when I sat down, what it would have been." He had not, however, negotiated with St. Mary for a check for the amount he received.

After receiving the check, plaintiff had no further conversations with St. Mary, because "it was my assumption that that was to pay my chiropractic bills, the way it read and my wages that were lost in the month of October." He interpreted the letter's statement that the amount sent "should fully settle the claim against McWilliams" to mean "the term that they owed me for the month. I thought they were paying the chiropractic bill." It was not his understanding, in cashing the check, "that the—any claim [he] may have had against McWilliams *** was taken care of." He also claimed that the check did not cover losses incurred prior to October 1986.

Plaintiff's first point is that the evidence upon which the court dismissed his case, at best, shows that he agreed to partial reimbursement for his claim, and not that he released defendant from all remaining liability; accordingly, he urges, the court erred in dismissing the claim. Defendant responds that plaintiff's cashing of the check with knowledge of the contents of the letter containing the check constituted acceptance of the condition stated therein that defendant be released from any further liability.

■■ ■ Section 2—619(a)(6) of the Civil Practice Law allows a "[d]efendant [to] *** file a motion for dismissal of the action *** upon the *** ground[ ][,] *** supported by affidavit: *** That the claim set forth in the plaintiff's pleading has been released ***." Plaintiff relies upon *Thornberry v. Board of Education* (1972), 8 Ill. App. 3d 351, in support of his argument that he did not release defendant from liability for the acts alleged in his complaint. In *Thornberry*, a case in which the plaintiff sought to enforce the settlement of his personal injury claim against the defendant (8 Ill. App. 3d at 353), the court held:

"[I]n a complaint to enforce the compromise and settlement of a personal injury claim, facts must be alleged which show liability to the claimant, agreement to pay an amount, acceptance of the agreement in settlement of the claim and that the agreement was concluded by disposition of the cause through *** the claimant's execution of or willingness to execute releases." 8 Ill. App. 3d at 354.

Plaintiff maintains that defendant "cannot prove that there was an agreement to settle the entire claim nor can it establish that the Plaintiff signed a Release." We hold, however, that the record made before the trial court reasonably led it to conclude that plaintiff's endorsement and cashing of the check with knowledge of the contents of the accom-

panying letter demonstrated an intent to release defendant from the claim.

The trial court relied upon *Michigan Leather Co. v. Foyer* (1902), 104 Ill. App. 268, in finding that plaintiff had released defendant from liability. In *Michigan Leather*:

> "There was a dispute between [the] parties as to the state of their account. *** [T]he Leather Company made up a detailed statement of the account as it understood it, named the balance thus found due, and sent [Foyer] its check for the same, accompanied by the statement that the check was in full settlement of the account. Upon the receipt of this letter and check it became the right of Foyer *** either to send back the check and sue upon his statement of the account, or to receive such check in full settlement." (104 Ill. App. at 269.)

Accordingly, the court held that "[t]he acceptance of the check involved the acceptance of the condition upon which it was offered." (104 Ill. App. at 269.) And in *Quaintance Associates, Inc. v. PLM, Inc.* (1981), 95 Ill. App. 3d 818, 822, the court held, "The acceptance of the check given in full satisfaction of a disputed claim is an accord and satisfaction if the creditor took the check with notice of the condition upon which the check was tendered."

Plaintiff does not dispute the applicability of this rule to the question of whether a party has released a claim, but argues that in light of *Clancy v. Pacenti* (1957), 15 Ill. App. 2d 171, cases like *Michigan Leather* and *Quaintance Associates*, which dealt with commercial transactions, should be "inapplicable." *Clancy*, however, dealt with whether a release was void as having been "based on a mutual mistake of fact with respect to the nature and extent of the injuries." (15 Ill. App. 2d at 172.) There was no issue in that case as to whether a release had been executed; the court simply held that "the peculiar character of personal injuries," the ease with which a mistake can be made and the serious consequences which could result from such mistakes, as well as "[t]he sharp economic inequality of the bargaining parties which generally exists in this class of cases," require that "courts *** take a broad view in affording relief for a release executed on a mistaken understanding of the nature and extent of personal injuries." 15 Ill. App. 2d at 176-77.

Thus, the *Clancy* court's separation of personal injury cases from other kinds of disputes was not made with reference to the question of whether a party had released another party from a claim, but rather to that of the instances in which such releases should be voided. Consequently, *Clancy* is applicable only to plaintiff's second argument, that the release should be voided as having been based upon mutual mistake.

In *Gutierrez v. Schultz* (1982), 109 Ill. App. 3d 372, the plaintiff, after filing a claim against the defendant allegedly responsible for his injuries, cashed a $6,000 check from the defendant's insurance company "which contained on its face *** [that it was] 'In payment of any and all claims including bodily injury arising from accident of 12-12-78 in Sterling, Illinois.' " (109 Ill. App. 3d at 374.) In addition, the record showed:

> "[T]he insurance agent had represented that the company would take care of everything, including lost wages. It also indicates [through evidence that the insurance adjuster 'told the plaintiff *** that if he needed money, [the insurance company] would advance it to him[,] *** [that] [n]o agreement for a $6,000 settlement was arrived at[,] *** that he had informed the adjuster previously [before receiving the check] that he was not satisfied with their offer *** [and] that some two or three weeks after he got the draft check, he received a release form *** to sign[,] *** [which he] threw *** in the garbage' (109 Ill. App. 3d at 374)] that plaintiff understood the check to be partial payment of his claim, and not final and complete payment." 109 Ill. App. 3d at 378.

■ The court held that "a genuine issue of fact was raised as to whether the check document was a release." (109 Ill. App. 3d at 378.) In the instant case, plaintiff admitted knowing about the letter's language that the check was intended to "fully settle the claim against [defendant]." Moreover, despite allegedly having a claim for costs incurred prior to October 1986, plaintiff never contacted the insurance company about his need to be compensated for those costs. Accordingly, the trial court was reasonably entitled to find that plaintiff cashed the check with the knowledge that it had been sent to him in the belief that no claim would be lodged against defendant for injuries resulting from his May 27, 1986 fall.

■ Next, plaintiff argues that even if the court correctly determined that he intended, at the time he cashed the insurance company's check, to release defendant from any further liability, the release should be void as leading to the unconscionable result of compensation of only "$820.00 for chiropractic care and one month's lost wages for a back sprain which, once all the facts were known, was in actuality a herniated disc." He points out that he "had apparently made a recovery as he had been without back pain for 9 months at the time of settlement, after having seen medical practitioners over 20 times during a 6 month period." He avers that he and defendant were wrong in believing he had recovered, and that, therefore, because his injury was not revealed by ordinary X rays, but rather through more sophisticated tests, and be-

cause he had acted with reasonable diligence in attempting to discover the extent of his injuries, a mutual mistake occurred which should have voided the release. Defendant responds that plaintiff failed to fulfill his burden of proving, by clear and convincing evidence, that a mutual mistake occurred, and that the trial court's determination thereof was not against the manifest weight of the evidence. Plaintiff, argues defendant, was aware that there might be future consequences from his injury, and further, that he failed to provide any evidence linking the May 27, 1986, accident with the herniated disc, or any evidence that he could not reasonably have discovered the herniated disc at an earlier date, particularly important factors when subsequent injuries to plaintiff are considered.

> "Releases may be set aside in equity where there appears to be mutual mistake with respect to the nature and extent of the injury sustained. [Citation.] *** [A] party who contends that the release was secured by *** mistake must prove his case by clear and convincing evidence. *** The modern trend is to set aside releases of personal injury claims in situations where the facts, when finally known, present an unconscionable result because of the equitable principle of doing justice under the circumstances of each case." (*Scherer v. Ravenswood Hospital Medical Center* (1979), 70 Ill. App. 3d 939, 942.)

A trial court's determination of mutual mistake will not be disturbed unless it is against the manifest weight of the evidence. *Reede v. Treat* (1965), 62 Ill. App. 2d 120, 131.

Plaintiff relies upon the facts in *Scherer* (70 Ill. App. 3d 939), *Meyer v. Murray* (1979), 70 Ill. App. 3d 106, *Reede* (62 Ill. App. 2d 120), and *Clancy* (15 Ill. App. 2d 171) to support his argument. In *Scherer*, the court identified the factors to be considered in determining whether a mutual mistake of fact occurred:

> "(i) that the parties believed plaintiff had recovered at the time of the release; (ii) the condition was one which ordinary X rays and customary examination did not reveal; and (iii) the evidence justified the conclusion that the plaintiff acted with reasonable diligence in ascertaining the extent of injury." (*Scherer*, 70 Ill. App. 2d at 945.)

In the cases plaintiff relies upon in which mutual mistake was found, there was evidence that the condition upon which the attempt to void the release was based was caused by the original incident. (See *Scherer*, 70 Ill. App. 3d at 941; *Meyer*, 70 Ill. App. 3d at 110; *Reede*, 62 Ill. App. 2d at 124; *Clancy*, 15 Ill. App. 2d at 173-74.) In fact, both *Reede* (62 Ill. App. 2d at 133), and *Clancy* (15 Ill. App. 2d at 178) specifically discussed

the requirement that there be proof of a causal connection. In the instant case, the "evidence" that plaintiff's herniated disc, "diagnosed *** on September 30, 1988," was even a "consequence" of his May 27, 1986, slip and fall, much less an "unexpected consequence" (*DeMarie v. Boston & Ohio Chicago Terminal R.R. Co.* (1979), 79 Ill. App. 3d 50, 54-55), consists solely of plaintiff's statement in his affidavit that "[a]s a result of the fall, I incurred medical bills, lost time and disability from a herniated disc." In the meantime, plaintiff had reinjured his back after returning to work, had "restrained" his back in October 1986 and had broken his neck on November 15, 1986, and had reinjured his back on September 17, 1988. In view of plaintiff's failure to provide the court with evidence that his original accident had resulted in the injury of which he was complaining, we cannot say the trial court erred in finding he had failed to show the existence of a mutual mistake of fact, and in dismissing his cause. Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

HARTMAN and DiVITO, JJ., concur.